**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**RODGER NEAL BYRD,**

   **Plaintiff,**

**v.**            **Civil Action No.: 5:11-CV-48**
                **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [12], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[14], AND AFFIRM THE RULING OF THE COMMISSIONER**

## I.  INTRODUCTION

On March 24, 2011, Plaintiff Rodger Neal Byrd ("Plaintiff"), by counsel Craig Lavender,

Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant

Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant

to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No.

1)  On May 18, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United

States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No.

8; Administrative Record, ECF No. 9)  On June 15, 2011, and July 13, 2011, the Plaintiff and the

Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J., ECF

No. 12; Def.'s Mot. for Summ. J., ECF No. 14)  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On June 5, 2008, the Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability beginning December 24, 2006.  (R. at 111-18)  Both claims were initially denied on August 27, 2008, and denied again upon reconsideration on December 11, 2008.  (R. at 66-69)  On February 3, 2009, the Plaintiff filed a written request for a hearing, which was held by video before United States Administrative Law Judge ("ALJ") Irma J. Flottman on January 22, 2010.  (R. at 27-65, 87-88)  The Plaintiff appeared in Parkersburg, West Virginia, and the ALJ presided over the hearing from Charleston, West Virginia.  (R. at 14)  Casey B. Vass, an impartial vocational expert, also appeared at the hearing.  Id.  On January 29, 2010, the ALJ issued an unfavorable decision to the Plaintiff, finding that he was not disabled within the meaning of the Social Security Act.  (R. at 14-25)  On February 23, 2011, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-5)  The Plaintiff now requests judicial review of the ALJ's decision denying his application for disability.

B.    Personal History

Rodger Neal Byrd was born December 14, 1963, and was 44 years old at the time he filed

his DIB and SSI claims. (R. at 113) He graduated from High School in 1983 and has prior work experience as a meat cutter and shelf stocker at a grocery store. (R. at 155, 159) He is single, has no children, and currently lives with his brother in a home owned by his mother. (R. at 117, 161)

C.    Medical History

On August 2, 2007, the Plaintiff visited Dr. Hande for a checkup, complaining of seasonal allergies. (R. at 261) Dr. Hande noted that the Plaintiff had evidence of erythema in his left big toe, consistent with gout, that showed up while playing tennis. (R. at 261) He was prescribed Fexofenadine for his allergies. Id. Additionally, Dr. Hande discussed the need for the Plaintiff to lose weight, and advised him that his blood pressure had been high on several occasions; however, the Plaintiff stated that his blood pressure at home was normal and that he did not want to take blood pressure medication. Id.

On September 21, 2007, Dr. Hande evaluated the Plaintiff's allergic rhinitis. (R. at 259) Dr. Hande recommended that the Plaintiff continue to take Fexofenadine for his allergies, and also provided him samples of Prolex to see if it would help him more than the Allegra. Id. Dr. Hande noted that the Plaintiff's blood pressure was elevated but the Plaintiff insisted that he did not want to take any blood pressure medications. Id.

On February 14, 2008, the Plaintiff visited Dr. Hande for a checkup, complaining of nasal congestion and arthritis in his knee. (R. at 257) The Plaintiff was diagnosed with Type II diabetes, obesity, degenerative joint disease, seasonal allergies, and hypertension. However, Dr. Hande noted that the Plaintiff did not want to take any medicine for his high blood pressure. Id.

Dr. Hande evaluated the Plaintiff and completed a physical examination form on April 29, 2008, for the West Virginia DHHR. (R. at 251-54) Dr. Hande found that the Plaintiff suffered from sharp intermittent low back pain and right shoulder pain, hypertension, gout, obesity, allergic rhinitis, possible obstructive sleep apnea syndrome, and Type II diabetes. (R. at 252, 254) Dr. Hande noted that the Plaintiff's diabetes was diet controlled and that his blood sugars had been better since he started cutting back on carbohydrates. (R. at 254) His blood pressure was usually within normal range when at home. Id. He had also been losing weight. Id. Dr. Hande opined that the Plaintiff could not work full-time at his customary occupation or like work, but was able to perform other full-time work. (R. at 252)

The Plaintiff visited Dr. Nutter, a state agency medical consultant, on August 13, 2008, for an internal medicine examination. (R. at 219-224) Dr. Nutter determined that the Plaintiff suffered from shortness of breath due to an undetermined cause; degenerative arthritis; and chronic Cervical, Thoracic, and Lumbar strain. (R. at 223) Dr. Nutter noted that although the Plaintiff complained of shortness of breath, he was not short of breath with mild exertion or in the supine position. Id. Additionally, the lungs were clear of any wheezes, rales, or rhonchi. Id. The Plaintiff did exhibit range motion abnormalities, abnormal reflexes, and muscle weakness. Id. However, the straight leg test was negative and there were no sensory abnormalities. Id. The Plaintiff did have joint pain, tenderness, and decreased range of motion. Id. However, there was no synovial thickening, periarticular swelling, nodules, or contractures that were consistent with rheumatoid arthritis. Id. The Plaintiff ambulated with a normal gait, was stable at station, comfortable in the supine and

sitting positions, and did not require a handheld assistive device.  (R. at 220)

Dr. Shaver, a state agency psychological consultant, completed a psychiatric review technique form on August 26, 2008, finding that the Plaintiff had no medically determinable mental impairment.  (R. at 226)  Dr. Shaver's conclusion was based on a third party report which stated that the Plaintiff's anxiety is directly related to his physical conditions.  (R. at 238)  This report was supported by information contained in the Plaintiff's adult function report and a physical from April 29, 2008.  Id.  Additionally, the Plaintiff had no psychological treatment, history or hospitalizations, or medication use that indicated a disabling psychological condition.  Id.

Dr. Gajendragadkar, a state agency medical consultant, completed a physical residual functional capacity form on August 26, 2008.  (R. at 248)  Dr. Gajendragadkar found that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds,  stand/walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation.  (R. at 242)  The Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, and could never climb ladders/ropes/scaffolds, crouch, or crawl.  (R. at 243)  He had no manipulative, visual, or communicative limitations.  (R. at 244-45)  He could have unlimited exposure to noise; must avoid concentrated exposure to extreme cold, heat, wetness, humidity, vibration, and fumes/odors/dusts/gasses; and must avoid all exposure to hazards.  (R. at 245)  Dr. Gajendragadkar found the Plaintiff partially credible, noting that his vision limitations are not disabling; he reported that he cannot walk for 15 minutes but he is able to shop for 2 hours; and despite reporting breathing problems, his lungs were clear on two evaluations.  (R. at 248)

A medical note dated October 28, 2008, states that the Plaintiff visited Dr. Hande for a

checkup and review of his allergies. (R. at 275-77) The Plaintiff weighed 331 pounds, with a BMI of 48.87, and had gained 10 pounds since his last visit. (R. at 275) His blood pressure was 156/94 while sitting. Id. The Plaintiff was alert and ambulatory; had normal ears, nose, mouth, and throat; had clear respiratory sounds with no rhonchi, rales, or wheezing; was obese; had degenerative joint disease in both knees; and was oriented x3 neurologically. (R. at 276) The Plaintiff was counseled on his diet and need for weight reduction and exercise, and was prescribed a nasal spray and Zyrtec for his allergies. (R. at 277)

Dr. Kim took X-Rays of the Plaintiff's lumbar spine, sacrum and sacroiliac joints, knees, and ankles on October 28, 2008. (R. at 285-90) Dr. Kim found mild degenerative arthritis with mild diffuse spondyloses in the lumbar spine. (R. at 285) There was no evidence of a compression fracture, alignment was normal, and the paraspinal soft tissues were unremarkable. Id. The Plaintiff's sacrum and sacroiliac joints were normal, with no evidence of acute fracture, dislocation, or significant degenerative changes and unremarkable overlying soft tissues. (R. at 286) The Plaintiff's left knee showed minimal degenerative arthritis with small osteophyte formations. (R. at 287) No evidence of acute bony injury or abnormal joint effusion was found. Id. The Plaintiff's right knee showed minimal degenerative arthritis, with minimal osteophyte formations and no abnormal joint effusion. (R. at 288) The Plaintiff's right and left ankles were normal. (R. at 289-90)

Dr. Bartee, a state agency psychological consultant, completed a psychiatric review technique form on December 9, 2008. (R. at 293-306) Dr. Bartee determined that the Plaintiff did not have a medicaly determinable mental impairment. (R. at 293) Dr. Bartee determined that the

medical evidence of record did not evidence a mental impairment. (R. at 305)

On December 11, 2008, Dr. Reddy, a state agency medical consultant, completed a physical residual functional capacity assessment, finding that the Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation. (R. at 308) Dr. Reddy found that the Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 309) He found no manipulative, visual, or communicative limitations. (R. at 310-11) The Plaintiff could have unlimited exposure to wetness, humidity, and noise; must avoid concentrated exposure to extreme cold, vibration, and fumes/odors/dusts/gases; and must avoid moderate exposure to extreme heat and hazards. (R. at 311) Dr. Reddy found the Plaintiff to be "minimally credible" and determined that he has no disabling physical limitations and no listing limitations. (R. at 312)

The Plaintiff visited Dr. Hande on June 18, 2009, for a checkup. (R. at 323) His weight was 349 lbs, his blood pressure was 146/70 (sitting, left arm), and his BMI was 51.53. (R. at 323) He complained of sinus drainage, sneezing, and itchy eyes, but denied suffering from coughing, wheezing, shortness of breath, and asthma. (R. at 324) His hypertension was better controlled. (R. at 323) He reported using a walker or cane when his gout was exacerbated. Id. He showed signs of anxiety. (R. at 324) He denied problems in his extremities, joints, muscles, or tendons, and his musculoskeletal evaluation was normal. Id. Dr. Hande diagnosed the Plaintiff with allergic rhinitis, asthma, obesity, hypertension, anxiety, and chronic back pain. (R. at 325) His prescriptions were updated and he was counseled on weight reduction, diet, and exercise. Id.

On August 22, 2009, the Plaintiff visited Dr. Kevak, complaining of gout pain after Dr.

Hande reduced his Indocin dosage.  (R. at 321)  He weighed 325 pounds and had 183/92 (sitting, right arm) blood pressure.  Id.  The Plaintiff appeared at the checkup using crutches.  (R. at 322)  He was alert, pleasant, neat/clean, and well nourished, with mild pain caused by the gout.  Id.  His left first metacarpal joint was swollen, red, and tender.  Id.  Dr. Kevak recommended decreasing consumption of processed foods and prescribed Colchicine tablets to help with the gout.  Id.

The Plaintiff visited Dr. Hande on September 25, 2009, for a checkup and refills of his medications.  (R. at 318)  He weighed 353 lbs, had a BMI of 52.12, and blood pressure of 148/94 (sitting, left arm) at the time of the checkup.  Id.  The Plaintiff was alert and ambulatory.  (R. at 319)  His ears, nose, mouth, and throat were normal and he denied coughing, wheezing, shortness of breath, and asthma; however, he complained of seasonal allergies.  (R. at 318-19)  He had a wide gait and complained of pain in his left knee.  (R. at 319)  He displayed tenderness in his big toe from gout, but Dr. Hande noted that the Plaintiff's gout from a previous episode had cleared up after taking medication.  (R. at 318-19)  Additionally, lab work showed that he had elevated sugar and triglycerides.  (R. at 320)  Dr. Hande diagnosed the Plaintiff with hypertension, Type II diabetes, gout, and obesity.  (R. at 319)  His medications were refilled and he was ordered to continue attempts at weight reduction.  (R. at 320)

The Plaintiff was administered a series of mental evaluation tests on December 3, 2009.  (R. at 326)  The tests were performed by John Atkinson, a medical assistant.  Id.  The Plaintiff scored at a full-scale IQ of 65, reading at 4.8 grade level and performing arithmetic at a 3.0 grade level.  Id.  He was listed as being "mildly retarded," and the administrator found the scores to be valid.  Id.

On January 7, 2010, Dr. Hande submitted a medical assessment of the Plaintiff's physical

work capabilities.  (R. at 329-32)  Dr. Hande determined that the Plaintiff was restricted to occasionally lifting 20 pounds due to lower back and right shoulder pain.  (R. at 329)  He could only walk for 1-2 hours and sit for 3-4 hours due to lower back pain, gout, and obesity.  (R. at 329-30)  He could never climb, balance, crouch, kneel, or crawl and could only occasionally stoop due to lower back pain.  (R. at 330)  He was restricted in heights, temperature extremes, chemicals, dust, fumes, and humidity due to allergies, back pain, obesity, and  gout.  (R. at 330-31)  He was occasionally limited in reaching due to right shoulder pain, back pain, and gout.  (R. at 331)  He was also limited in sight due to vision problems with his left eye.  (R. at 332)

E.    Testimonial Evidence

At the ALJ hearing held on January 22, 2010, the Plaintiff testified that he completed twelve years of primary education in regular courses, without any special education classes.  (R. at 34)  He has a driver's license.  Id.  He can read the newspaper if the words are simple.  (R. at 34-35)  He can do simple arithmetic – single digit addition and subtraction.  (R. at 35)  He said that he could only count change in small amounts, like a single dime, but otherwise just takes whatever change is given to him when he buys an item.  Id.

The last time the Plaintiff worked was about 3 years before he filed his disability claim, when he worked as a telemarketer.  (R. at 37)  He worked at one time in a grocery store meat department, grinding and wrapping ground meat and occasionally helping cut meat.  Id.  The steaks would simply be sliced from a pre-cut section of meat, and the ground meat would come in a tube that simply needed to be fed into the grinder.  (R. at 37-38)

The biggest medical problem affecting the Plaintiff is gout.  (R. at 38)  He was having more

frequent flare-ups over the months leading up to his application, and at the time of the hearing he claimed to get a severe flare-up every 4-6 weeks.  <u>Id.</u>  When he has a flare-up, he has to use a walker.  <u>Id.</u>  His next major impairment is arthritis in the back and shoulder, which when it flares up prevents him from doing anything.  <u>Id.</u>  He also claimed to have severe allergies and anxiety.  <u>Id.</u>

The Plaintiff's gout flares up severely every three months or so, but he has little flare-ups on a regular basis that last three to four days.  (R. at 39)  He only goes to the doctor for the severe flare-ups, which cause him to go to the emergency room.  <u>Id.</u>  He takes medication for the gout, which seems to control it for a time, but it then flares back up again.  <u>Id.</u>  The gout tends to be in his left foot, ankle, and toes.  (R. at 40)  He was prescribed crutches for one of his flare-ups, but claims that he must use a walker to function.  <u>Id.</u>  The gout is the most severe pain he has ever had, and it causes his foot to swell up to about three times its normal size.  (R. at 54)  His severe flare-ups last for 11-18 days at a time.  (R. at 55)

The Plaintiff's arthritis causes him swelling in his back whenever he attempts to do anything, causing him to need two to three days of rest.  (R. at 40)  His right shoulder has severe pain whenever he moves his arm.  <u>Id.</u>  He also claims to have arthritis in his thumbs and elbows.  (R. at 40-41)  He does not take medication for the arthritis because it would interact with his gout medication.  (R. at 41)  He does, however, go to a chiropractor, whose treatments do seem to help but the arthritis then flares back up.  <u>Id.</u>  He uses Biofreeze[1] and warm baths, which in combination seem to help the symptoms.  (R. at 42)

---

[1] Biofreeze is a brand of topical pain-relief products that uses menthol to stimulate the body's cold receptors.  <u>See</u> Biofreeze, <u>http://biofreeze.com</u> (last visited July 11, 2011).

The Plaintiff has stomach bloating that is related to his back pain.  (R. at 42)  When his back swells his stomach feels bloated, and he gets relief by staying idle.  Id.  He takes Tylenol, which seems to help the bloating and pain.  (R. at 43)

The Plaintiff's allergies bother him "24/7, all the time."  (R. at 43)  He takes an allergy pill and a nasal spray every day.  Id.  If he comes into contact with any sort of smell he plugs up and cannot breathe.  Id.  He has had mild asthma attacks that last three to five minutes at a time.  Id.  If he cannot get away from things that he is allergic to, he will throw up.  (R. at 44)

The Plaintiff is a borderline diabetic, which he manages without medication by monitoring his diet.  (R. at 58)  However, he claimed to be having some yeast and fungal infections around his neck and arms, caused by elevated sugar levels.  (R. at 58-59)  The infections burn and itch, but he keeps them under control with prescription creams.  (R. at 59)

The Plaintiff has anxiety attacks three to four times per month.  (R. at 44)  He feels like his surroundings are closing in on him, and needs to get some fresh air or talk to someone.  Id.  He takes medication when he has an attack.  Id.

The Plaintiff testified that he likes to watch older shows and movies.  (R. at 49)  When asked about the last movie that he watched, he stated that he watched a movie two days earlier but could not remember the name of it as he is bad with remembering names of things.  Id.  He stated that he has trouble with focus, and claims that he loses interest in things because he gets distracted by pain. (R. at 58)

The Plaintiff can walk about 75 yards at the most before his back, shoulders, and stomach start to flare up and swell.  (R. at 49)  He can only sit for about half an hour before his back begins

to hurt.  (R. at 50)  When riding in a car, he has to stop every 20 to 25 minutes to stretch.  (R. at 55)

He can walk or stand for about 20 minutes at a time.  (R. at 50)  He said he cannot lift anything

without having three to four days of pain.  Id.  He is right-handed, and can lift overhead to retrieve

dishes from the cupboard.  (R. at 50-51)  He can only use his arms for about 15-20 minutes at a time

before he starts to get pain.  (R. at 56)  Any kind of activity that lasts for 20-30 minutes or longer

"tears him all up" and he must stop.  (R. at 56-57)  He has trouble with personal hygiene, such as

wiping after using the restroom, because he cannot reach himself to clean.  (R. at 57)

The Plaintiff can button his shirt unless his fingers or hands swell, which occurs once every

couple days.  (R. at 51)  He cannot touch his knees or the ground.  Id.  He cannot climb or descend

stairs or inclines, which bother his back and legs and cause balance problems.  (R. at 52)  When he

gets out of bed he has balance problems as well.  Id.

The Plaintiff gets about three to four hours of sleep each night.  (R. at 53)  He does not sleep

longer due to pain, which causes him to move around.  Id.  He feels tired all day, which causes him

to take a nap in the afternoon every day.  Id.  He elevates his legs while napping and while sleeping

to help cut down on swelling in his legs and ankles.  (R. at 54)

F.      Vocational Evidence

Stacey Bass, a vocational expert, testified at the ALJ hearing on January 22, 2010.[2]  (R. at

---

[2] The undersigned notes that the transcript of the VE's testimony is rife with
unintelligible sections due to problems with the audio at the hearing.  The undersigned, in an
effort to be as thorough and complete as possible, has relied on the transcript "as is" and used
information from sections six and ten of the ALJ's decision to fill in the gaps.  The undersigned
notes that the Plaintiff has not challenged the testimony of the VE or the hypotheticals posed by
the ALJ.

59-63)  Mr. Bass identified the Plaintiff's regional economy as the states of West Virginia, Virginia,

Maryland, and the District of Columbia.  (R. at 60)  Mr. Bass identified the Plaintiff's past relevant

work as follows:

> A.     Past work, as indicated, [unintelligible] was a meat cutter.  [Unintelligible].
>        Skill level was six.  Based on the shipments [inaudible] that was going out,
>        I think that's probably a little high on the script.  I would give him SVP of
>        three.

(R. at 60)  As noted in the ALJ's decision, the VE characterized the Plaintiff's past relevant work

as skilled (SVP 6) and is listed as heavy exertion in the Dictionary of Occupational Titles; however,

the Plaintiff actually performed the work as heavy, semi-skilled (SVP 3).  (R. at 23)  The ALJ then

inquired as to whether the Plaintiff could perform his past relevant work:

> Q.     What's [inaudible]?    [Inaudible question]    Should avoid concentrated
>        exposure to extreme cold. Witness working [inaudible]. Excessive vibration,
>        irritants, [inaudible].  To avoid [inaudible], exposure to extreme heat, and to
>        avoid all exposure to [inaudible, mumbling].  Work is limited in [inaudible].
>        With reading on the fourth-grade level and math at the three-point grade
>        level.  [inaudible]
>
> A.     No.

(R. at 61)  The ALJ found that the Plaintiff could not perform his past relevant work.  (R. at 23)  Mr.

Bass then provided some light physical jobs that the Plaintiff could perform:

> Q.     Okay.  Assuming a hypothetical individual of the same ag and education and
>        work background, [inaudible]?
>
> A.     Light physical jobs.  I would list the job of hand-packer would be --
>
> Q.     Wait.
>
> A.     The DOT [inaudible], 784-437–

ATTY:        Your honor, I'm sorry.  I couldn't hear the DOT.  The audio's cutting
             out.

A.           DOT number 784.6875042.  Hand-packer.  In the nation: 190,500 jobs.
             Region: 11,200 jobs.  An assembler, DOT number 7066875010.  In the
             nation: 682,300 jobs.  Region: 31,800 jobs.  A fast-food worker: DOT
             number 3114725010.  In the nation: 305,500 jobs.  Region: 9200 jobs.  These
             are light unskilled jobs.

Q.           And the fast-food worker can be performed with the [inaudible] reading and
             math level that I gave him?

A.           Yes.  This would not be a cashier.

(R. at 61-62)  As noted in the ALJ's decision, the VE testified that, based on the RFC assigned, the

Plaintiff could perform the positions of a hand packer, assembler, and fast food worker.  (R. at 24)

The ALJ then changed the hypothetical to include more limitations on the Plaintiff's physical

capabilities:

A.           Let's change the [unintelligble] capacity to basically – the lifting requirement
             is still at the light level.  Up to 20 pounds, occasionally.  The individual
             would need to be able to alternate between sitting and standing, and at least
             once every 30 minutes.  As some limitations, with walking up to 75 yards
             one time.  But has some difficulty standing in one position for a prolonged
             period of time.  [inaudible], it will take me a second.  The individual can sit
             a total of three to four hours a day.  As I mentioned, he may be able to
             alternate between sitting and standing.  Standing and walking for a total of
             two hours in an eight-hour day.  Individual ahs a number of problems with
             using the upper extremities.  Reaching with both arms would be restricted to
             an occasional basis.  Likewise, handling things that require feeling, limit to
             [inaudible].  The environmental indications I gave were the same.  He gave
             me the [inaudible] code?

A.           No.

Q.           And again, the limitation I gave, that work is done [inaudible] in the past
             with [inaudible].  With those limitations, are there job positions available?

A.      No.

Q.      And is there any one thing in particular that precludes work, or just [inaudible]?

A.      Well, the sitting and standing comment gives at best a six-hour day, and it's further complicated with the use of the upper extremities on an occasional basis. That's another complication.

(R. at 62-63) Finally, the Plaintiff's attorney posed an additional hypothetical to Mr. Bass:

ATTY:      Your honor, just maybe one additional hypothetical question. Mr. Bass, if you take the judge's second hypothetical that she posed, where you listed jobs as a hand-packer, assembler, and fast food, you had a person that would need to elevate their legs maybe one to two hours, four times a week, also would have attacks of gout that may require them to miss work at least two days a week, does have trouble with their arms – after about 20 minutes of using their arms, they'll have to stop and break. Would you be able to identify any jobs for someone with those limitations?

A.      No, I would not.

(R. at 63)

G.      <u>Lifestyle Evidence</u>

At the ALJ hearing, the Plaintiff testified that he wakes up around 7-8 AM, eats breakfast, then sits on the couch and watches television. (R. at 46) He takes a nap for a few hours in the afternoon and then watches television until he goes to bed. <u>Id.</u> He says he sometimes sits outside on the porch during the summer. (R. at 47) He does not cook or do any of the work around the house – his brother cooks meals and does chores, and his sister does everything else. <u>Id.</u> His sister or his mother does his laundry. <u>Id.</u> He occasionally goes shopping, but only spends about 15 minutes or so in the store and does not lift anything because of his back. (R. at 47-48) He sees his

sister and brother daily, and sees the rest of his family once a week. (R. at 48) He has friends from high school, but he does not see them very often, and may get a visitor once every six months to a year. Id. He does not attend church or belong to any social groups. Id. He used to hunt and fish but no longer does so due to his allergies, and he has not attended a sporting event for seven to eight years. (R. at 49)

On an adult function report dated June 30, 2008, the Plaintiff stated that on a typical day he eats breakfast, takes his medication, goes outside some, rests, watches television, and gets the mail. (R. at 161) He lives in a cabin with his brother. Id. He does not cook for himself or do chores. (R. at 163) He goes outside two times a day depending on the weather. (R. at 164) He can drive a car, and will drive and travel alone. Id. He goes food shopping once a month for roughly two hours at a time. Id. He is able to pay bills and count change, but has never used a checking or savings account. Id. He likes to hunt and fish but cannot do so anymore due to health conditions; instead he watches television. (R. at 165) He spends very little time with others except for his family members, whom he visits on Sundays. Id.

H.    Other Evidence

An undated medication form states that the Plaintiff, at the time he filed his claim, was taking the following medications prescribed by Dr. Hande:

•      Lisinopril 20 mg for blood pressure – one tab 2 times a day;

•      Indomethacin 25 mg for gout – one tab 3 times a day;

•      Uloric 40 mg for gout – one tab daily;

•      Veramyst 27.5 mg for allergies – 2 sprays daily;

- Cetrizine HCL 10 mg for allergies – one tab daily;

- Alprazolam 25 mg for panic attacks – one tab daily

- Hydroxyzine HCL 25 mg for breathing/lungs – one tab daily;

- Ketoconazole 2% Shampoo for fungus – used as needed;

- Nystatin / Triamcinalone Cream for yeast infections – used as needed.

(R. at 213)  The Plaintiff also takes one non-prescription 500 mg tablet of Tylenol twice daily.  Id.

### III.  CONTENTIONS OF THE PARTIES

The Plaintiff, in his motion for summary judgment, alleges two errors in the ALJ's decision:

- The ALJ's decision to reject the opinion of the Plaintiff's treating physician, Dr. Hande, is not supported by substantial evidence; and

- The ALJ erred in finding that the Plaintiff did not meet the requirements of Listing 12.05(c).

(Pl.'s Mot. for Summ. J. 2, ECF No. 12)  The Plaintiff requests that the Court reverse the ALJ decision and award benefits or remand the case for further proceedings.  Id. at 13.  The Commissioner argues in his motion for summary judgment that the ALJ's decision is supported by substantial evidence and should be affirmed as a matter of law.  (Def.'s Mot. for Summ. J. 1, ECF No. 14)  In support, the Defendant argues that:

- Dr. Hande provided two inconsistent medical opinions and his opinion finding the Plaintiff unable to perform all work is unsupported by his own medical findings as well as other medical evidence in the record; and

- The Plaintiff failed to meet his burden of proving that he meets Listing 12.05(c) because his school records indicate that he graduated from High School without any special education, both the Plaintiff's treating physician as well as the state agency consultants failed to find a problem with his intellectual functioning, and the evidence that the Plaintiff relies upon is a one-time mental status evaluation that fails to include an explanation of its findings.

(Def.'s Br. in Supp. 11-15, ECF No. 15)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence.  See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Because review is limited to whether substantial evidence supports the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations."  Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976).  Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.      Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five

steps, the process does not proceed to the next step.  Id.

B.      The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1.      **The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.**  (R. at 16)

2.      **The claimant has not engaged in substantial gainful activity since December 24, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**  (R. at 16)

3.      **The claimant has the following severe impairments: obesity; asthma; chronic cervical, thoracic, and lumbar strain; mild degenerative disc disease of the lumbar spine; mild degenerative joint disease of the knees; gout in the left lower extremity with periodic flare ups; and reading at grade level 4.8 and math at grade level 3.0.  (20 CFR 404.1520(c) and 416.920(c)).**  (R. at 16)

4.      **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**  (R. at 18)

5.      **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he should avoid all exposure to hazards, moving machinery and heights; concentrated exposure to extreme cold, wetness, humidity, vibrations, irritants, fumes, odors, dust, and gases; and moderate exposure to extreme heat.  He can perform only simple, routine, repetitive tasks; and reads at a 4.8-grade level and does math at a 3.0-grade level.**  (R. at 20)

6.      **The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**  (R. at 23)

7.      **The claimant was born on December 14, 1963, and was 43 years old,**

which is defined as a younger individual age 18-49, on the alleged disability onset date **(20 CFR 404.1563 and 416.963).** (R. at 24)

8. **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).** (R. at 24)

9. **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).** (R. at 24)

10. **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).** (R. at 24)

11. **The claimant has not been under a disability, as defined in the Social Security Act, from December 24, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).** (R. at 25)

C.    The ALJ Properly Weighed The Opinion Evidence Offered By Dr. Hande

The Plaintiff's first assignment of error is that the ALJ failed to give an adequate discussion of her reason for rejecting the opinions of Dr. Hande, the Plaintiff's treating physician.[3] (Pl.'s Mot. For Summ. J. 3-7, ECF No. 12)  The Plaintiff argues that the ALJ was required to set forth in her decision a discussion of each of the factors contained in 20 C.F.R. §§ 404.1527(d) and 416.927(d), but failed to do so.  Id. at 5.  The Plaintiff also asserts that the ALJ improperly weighed the evidence by citing selectively to the record and accepting evidence developed by the state agency consultants over evidence offered by the Plaintiff's treating physicians.  Id. at 6-7.  The undersigned finds that

---

[3] The undersigned notes that the ALJ did not reject Dr. Hande's opinions, but rather assigned them little weight.  (R. at 23)

the Plaintiff's arguments lack merit because the ALJ is not required to set forth the § 404.1527(d) and 416.927(d) factors in her discussion and the ALJ in this case provided an adequate explanation of her reasons for assigning little weight to Dr. Hande's opinions.

First, the ALJ was not required to discuss the §§ 1527(d) and 416.927(d) factors in her notice of decision. Title 20, Part 404, Section 1527(d) and Title 20, Part 416, Section 927(d) of the Code of Federal Regulations governs how the Social Security Administration weighs medical opinions. Unless controlling weight is assigned to a treating source's medical opinion, the following factors are considered in deciding how to weigh any medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d) Social Security Ruling 96-2p specifically addresses the ALJ's duty of explanation when a treating source opinion is not given controlling weight and the ALJ's decision is a denial of benefits, stating that:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. See Pinson v. McMahon, 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

Second, the ALJ properly weighed Dr. Hande's opinion because his opinion is inconsistent

with other evidence in the record, including his own medical records and the opinions of the state agency medical consultants. The opinion of a treating physician will be given controlling weight only if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. See 20 C.F.R. §§ 414.1527(d), 416.927(d). Dr. Hande, on a medical assessment form dated January 7, 2010, opined that the Plaintiff suffered from numerous disabling limitations due to lower back pain, shoulder pain, obesity, gout, degenerative joint disease ("DJD"), and breathing problems stemming from allergic rhinitis. (R. at 329-330) However, as noted by the ALJ, the following evidence in the record contradicts Dr. Hande's findings:

- On August 2, 2007,[4] the Plaintiff sought treatment from Dr. Hande for a flare-up of gout that reportedly occurred after playing a game of tennis. (R. at 22, 261);

- Dr. Nutter, a state agency consultant, found that the Plaintiff ambulated with a normal gait; appeared stable at station, was comfortable in the supine and sitting positions; had normal straight leg raise in the sitting and supine positions; could stand on one leg with no difficulty; had normal sensations; was negative for the Romberg sign; could walk on heels and toes with difficulty; and had normal muscle strength in the extremities. (R. at 22, 219-224);

- Radiology reports from Dr. Hande's medical records, dated October 28, 2008 and electronically signed by Dr. Hande on October 30, 2008, showed only "mild degenerative arthritis with spondyloses, normal sacrum and sacroiliac joints, minimal degenerative

---

[4] The ALJ's decision erroneously references a date of August 22, 2007. The date given on Dr. Hande's report is August 2, 2007. (See R. at 261)

arthritis with small osteophytes formation, and normal ankle examinations." (R. at 22, 285-90);

- A medical note from Dr. Hande's office dated June 18, 2009, states that the Plaintiff denied problems in his extremities, joints, muscles, or tendons. (R. at 22, 324);

- Dr. Hande noted on September 25, 2009, that the Plaintiff's gout was better after taking medication. (R. at 22, 318);

- The Plaintiff, on August 13, 2008, informed Dr. Nutter that he had never been diagnosed with asthma, emphysema, chronic bronchitis, COPD, pneumonia, or tuberculoses. (R. at 22, 219) The Plaintiff did not use inhalers, and upon examination he was not short of breath upon mild exertion or in the supine position. (R. at 22, 219, 223);

- Dr. Hande's records from October 28, 2008, show that the Plaintiff had clear breathing sounds, no rhonchi, no rales, and no wheezing. (R. at 22, 276);

- Dr. Hande's records from June 18, 2009 and September 25, 2009, report that the Plaintiff denied coughing, wheezing, shortness of breath, and asthma. (R. at 22-23, 324, 319)

In addition to the above medical evidence, the ALJ also noted that Dr. Hande, in a previous medical opinion offered to the WV DHHR on April 29, 2008, found that the Plaintiff, while unable to perform his past relevant work, would be able to perform other full-time work if he is limited to avoiding dusty, smoky environments. (R. at 23, 252) There is ample inconsistent evidence in the record to justify the ALJ's decision to assign lessened weight to Dr. Hande's opinions, and the Plaintiff's suggestion that the evidence cited by the ALJ is less valuable due to its source is not only incorrect but also irrelevant to the ALJ's findings in this case – the Social Security regulations

specifically provide that the ALJ must consider the opinions and findings of State Agency consultants, see 20 C.F.R. §§ 404.1527(f)(2)(i) and 419.927(f)(2)(i), and, in any event, the majority of the evidence cited by the ALJ comes from the medical records of the Plaintiff's own treating physician. Accordingly, the undersigned Magistrate Judge finds that substantial evidence supports the weight assigned to Dr. Hande's opinions.

D.     The Plaintiff Does Not Meet Listing 12.05(c)

As his second assignment of error, the Plaintiff asserts that the ALJ erred in determining that he did not meet Listing 12.05(c). (Pl.'s Mot. For Summ. J. 7-13, ECF No. 12) In support, the Plaintiff argues that the ALJ wrongly concluded that the Plaintiff's IQ scores were invalid, improperly interpreted his academic records, and overstated his activities of daily living and ability to independently function. Id. However, the undersigned finds that the Plaintiff has not carried his burden in proving that he meets all of the requirements of the Listing.

To be found mentally retarded under Listing 12.05, the Plaintiff must prove "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" and show that his symptoms meet the severity requirements of one of four subsections 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2010). For the Plaintiff's intellectual deficits to meet the severity requirement of Listing 12.05(c), he must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2010).

The Plaintiff bears the burden of proving that he meets all of the requirements of a listing.

<u>See</u> 20 C.F.R. §§ 404.1512(a), 404.1525(c)(3), 416.912(a), 416.925(c)(3).  As explained by the United States Supreme Court, the Listing of Impairments is intentionally designed to be a more rigorous standard of disability:

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity."  The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.  That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

<u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990) (internal citations omitted).

When evaluating whether a claimant meets one of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms.  <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986).  "<u>Cook</u>, however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." <u>Russell v. Chater</u>, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (Table).  The ALJ's duty of explanation is satisfied when he provides findings and determinations sufficiently articulated to permit meaningful judicial review.  <u>See</u> <u>DeLoatche v. Heckler</u>, 715 F.2d 148, 150 (4th Cir. 1983).

In this case, the Plaintiff has failed to carry his burden in establishing that he meets Listing 12.05(c).  As noted by the ALJ, the only evidence indicating that the Plaintiff has an IQ between 60 to 70 is a one-time examination by a non-treating psychologist whose report consists only of a bare summary that is unaccompanied by any form of narrative report or explanation of the testing and

results.  (See R. at 20, 326)  The findings of this examination stand in contrast to the fact that the

Plaintiff graduated from High School,[5] displayed normal mental functioning and memory at an

examination by Dr. Nutter, obtained a valid driver's license, and performed semi-skilled work for

four years.  (R. at 20)  The ALJ is not obligated to accept the mental status report offered by the

Plaintiff if other contradictory evidence exists in the record, particularly when the examiner fails to

provide adequate support for his findings.  See 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(e) (2010)

("The more a medical source presents relevant evidence to support an opinion, particularly medical

signs and laboratory findings, the more weight we will give that opinion.  The better an explanation

a source provides for an opinion, the more weight we will give that opinion.").  Accordingly, the

undersigned Magistrate Judge finds that substantial evidence supports the ALJ's determination that

the Plaintiff failed to establish that he meets the requirements of Listing 12.05(c).

## VI.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's

application for Disability Insurance Benefits and Supplemental Security Income is supported by

substantial evidence.  Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary

Judgment (ECF No. 14) be **GRANTED**, the Plaintiff's Motion for Summary Judgment (ECF No.

12) be **DENIED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED**

---

[5] The Plaintiff's objection to the ALJ's discussion of his academic records is without merit.  The Plaintiff's records clearly show that he graduated from High School, and although he graduated nearly last in his class, he was, as pointed out by the ALJ, continually absent from school, with 29 absences in ninth grade, 24 in tenth grade, 58 in eleventh grade, and 46 in twelfth grade.  Id.  The undersigned agrees with the ALJ that missing an average of 39 days per year would undoubtedly have a negative impact on the Plaintiff's grades.

**WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **1st** day of **August**, **2011**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE